UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOSEPH WILKINS,

                              Plaintiff,

        -against-                                        5:11-CV-0686 (LEK/ATB)

TIME WARNER CABLE, INC.,

                              Defendant.
_____

## MEMORANDUM-DECISION and ORDER

## I.     INTRODUCTION

        Plaintiff Joseph Wilkins ("Plaintiff") brought this employment discrimination action against

his former employer, Defendant Time Warner Cable, Inc. ("Defendant").  Dkt No. 1 ("Complaint").

Presently before the Court is Defendant's Motion for Summary Judgment and Plaintiff's Cross-

Motion to amend the Complaint.  Dkt. Nos. 24 ("Motion"); 31 ("Cross-Motion").  For the following

reasons, Plaintiff's Cross-Motion is granted and Defendant's Motion is granted in part and denied in

part.

## II.    BACKGROUND

### A.  Plaintiff's Employment

        Defendant is a cable, telephone, and internet services provider.  Dkt. Nos. 24-14 ("SMF")

¶ 3; 32 ("Response SMF") ¶ 3.  Plaintiff began working for a predecessor of Defendant in June

1983, and worked for Defendant or its predecessors continuously until April 2010.  SMF ¶ 1; Resp.

SMF ¶¶ 1, 35, 37.  Plaintiff states that he worked as a Direct Sales Representative ("DSR") from

1983 until around 2005, when he took the position of Multi-Dwelling Unit[1] ("MDU") salesman. Resp. SMF ¶¶ 5, 36.[2] Plaintiff sold Defendant's cable, telephone, and internet services directly to customers at their homes or to property managers of residential MDUs. SMF ¶ 5; Resp. SMF ¶ 5. Throughout his employment, Plaintiff's compensation consisted of sales commissions and a small base salary. Dkt. Nos. 26-27 ("Wilkins Deposition") at 45:13-46:6. Plaintiff was a good performer and received positive performance evaluations. SMF ¶ 6; Resp. SMF ¶ 6. To ensure that Plaintiff's commission-based compensation did not increase beyond a certain level, Defendant would not assign Plaintiff new MDUs for additional sales. Wilkins Dep. at 186:12-16.

Plaintiff was amongst the oldest and longest-tenured salespeople at his workplace. Id. at 186:7-8; see also Resp. SMF ¶ 33. For the last six or seven years of Plaintiff's employment, his supervisor and most other employees referred to him as "Grandpa" or "Grandpa Joe," a nickname that Plaintiff told others they could use. Compl. ¶¶ 15-16; SMF ¶ 33; Resp. SMF ¶ 33.

**B. Cessation of Employment**

*1. The Edwards Meeting*

According to Plaintiff, on April 1, 2010, his supervisor, William Edwards ("Edwards"), requested a meeting on April 2 at 9:00 a.m. Resp. SMF ¶ 37. Although Edwards arrived at the office at 9:30 a.m., he did not meet with Plaintiff until 11:50 a.m., explaining to Plaintiff that there were "too many people in the office." Id. ¶ 38. Edwards took Plaintiff outside the building, where he told him that the MDU specialist position would be changing and that Plaintiff should retire.

_____

[1] Multi-Dwelling Unit means a property containing multiple residential units, such as an apartment building. Dkt No. 26 at 17:14-20.

[2] Defendant maintains that Plaintiff was always employed in the DSR position, including during 2005 to 2010. SMF ¶ 5.

Resp. SMF ¶ 40.  Edwards would not tell Plaintiff exactly what changes would happen, but told

Plaintiff his position would be eliminated and that, within three days, Plaintiff would need to get

"all new buildings"—i.e., Plaintiff would lose all his sales accounts and would need to find new

ones.  Resp. SMF ¶¶ 15, 41; Dkt. No. 30-2 ("Wilkins Declaration") ¶ 7; see also SMF ¶ 15.

Edwards also told Plaintiff that he "didn't fit in anymore."  Resp. SMF ¶ 15.  Plaintiff told Edwards

that he did not want to retire.  Id. ¶ 43.

Defendant acknowledges that Edwards told Plaintiff that the MDU job would be changing,

but contends that Edwards told him no plan was in place for what changes would be made and that

Edwards did not tell Plaintiff his position would be eliminated.  SMF ¶¶ 9, 15.

### 2. The Keib Meeting

Defendant maintains an "Open Door Policy," which provides that "employees should feel

comfortable bringing their concerns about work related situations to the attention of management."

SMF ¶ 4; Dkt No. 24-13, Ex. I ("Open Door Policy").[3]

After the conversation with Edwards, Plaintiff sought a meeting with John Keib ("Keib"),

the "President of the Northeast Region."  Resp. SMF ¶ 44.  Keib's secretary informed Plaintiff that

Keib was available for a "quick meeting" around 4:15 p.m.  Id.  Plaintiff met with Keib as arranged

and told him that he had spoken with Edwards and that he did not want to retire.  Id. ¶ 45.  Keib did

not ask Plaintiff what he meant by not wanting to retire.  Id. ¶ 46.  Keib told Plaintiff that he could

work part-time, but Plaintiff responded that he did not want to work part-time because he would not

receive benefits.  Id. ¶ 47.  Keib told Plaintiff that he would talk to HR and see what he could do for

---

[3] Defendant also maintains anti-discrimination policies which prohibit unlawful
discrimination and harassment based on age.  SMF ¶ 4.  Plaintiff received a copy of both the anti-
discrimination and open door policies during his employment.  SMF ¶ 4; Resp. ¶ 4.

Plaintiff. Wilkins Decl. ¶ 9; Resp. SMF ¶ 48. The entire meeting lasted about five minutes. Wilkins Decl. ¶ 9. Keib and Plaintiff scheduled a second meeting for April 13, 2010, at 8:30 a.m. Resp. SMF ¶ 49.

When Plaintiff arrived for the April 13 meeting, he waited two hours before Keib's secretary informed him that Keib was not there and could not meet with him. Resp. SMF ¶ 50. Plaintiff felt humiliated. Wilkins Decl. ¶ 10. Keib's secretary told Plaintiff that she would set up another meeting and then call Plaintiff. Resp. SMF ¶ 50. Plaintiff never heard from Keib after that. Id. ¶ 51. He called three times to set up another meeting, but was told each time that Keib was not available. Id. ¶ 52.

### 3. The HR Meeting

Plaintiff had previously decided to use some vacation time he had accrued, but first needed the signature of Edwards or a Human Resources ("HR") representative. Id. ¶ 53. As of April 2010, Edwards had not signed Plaintiff's vacation time request. Id. Following the April 2 meeting with Edwards, Plaintiff called Edwards several times and left messages regarding both his desire not to retire and approval of his vacation time request. Id. ¶ 54. Edwards never responded to those calls. Id. Plaintiff then went to HR for approval of his vacation time request. Id. ¶ 55. While meeting with the HR representative, Plaintiff mentioned that it was possible he would have to retire. Id. ¶ 55. As he was about to leave the HR meeting, the HR representative told him that if he was going to retire, he would need to create a letter stating his intention to do so. Id. ¶ 56. Plaintiff asked her if he could retract the letter if he did not end up retiring, and she said he could. Id. ¶ 57. With the HR representative's assistance, Plaintiff drafted a letter stating that he intended to retire after April 29, 2010, which was the end of his planned vacation. Id. ¶¶ 7, 57; SMF ¶ 7; Dkt No. 24-8, Ex. B

("Retirement Letter").

Plaintiff states that he intended to keep his job or switch to a different full-time position by speaking with Keib and/or Edwards. Resp. SMF ¶¶ 58-59. However, neither Keib nor Edwards met with Plaintiff after he signed the letter. Id. ¶¶ 60, 62.

### C. Exit Interview and Benefits

Plaintiff maintains that every employee who leaves Defendant has an exit interview. Resp. SMF ¶ 64. According to Plaintiff, his exit interview was scheduled for April 30, but when Plaintiff arrived Edwards was not there and his administrative assistant told Plaintiff that he had called to say he was not coming. Id. ¶ 63; Wilkins Decl. ¶ 14. An exit interview was therefore never held. Resp. SMF ¶ 63.

According to Defendant, an exit interview was conducted with Plaintiff on or about April 16, after Plaintiff had signed the Retirement Letter. Dkt No. 24-7 ("Petitto Declaration") ¶ 7. As evidence of this interview, Defendant submits a copy of an email from an HR manager to Plaintiff congratulating him on his retirement and informing him that Defendant's "exit 'interview' is now done electronically so [she] will send [him] that link in a separate email." Dkt No. 24-8, Ex C. The email includes as an attachment a generic, two-page information sheet entitled "Benefits Information for Separating Employees." Id. The sheet includes brief summaries and contact information for several benefit plans, including medical coverage and pension plan benefits. Id. It does not mention severance pay or benefits, see id., although Defendant does maintain a Severance Pay Plan that provides benefits to departing employees under certain circumstances, see SMF ¶¶ 18-20; Resp. SMF ¶¶ 18-20; Dkt No. 6, Ex. A; Dkt. No. 24-9 ("Plan").

Plaintiff states that he was never trained to use his office email account, and that it was

common knowledge at his office that he did not know how to use it.  Wilkins Decl. ¶ 18.  He therefore never received the exit interview email or the benefits information sheet.  Id.  Furthermore, he was on vacation at the time the email was sent to him.  Id.

After his employment ended, Plaintiff received medical and pension benefits.  SMF ¶ 8; Resp. SMF ¶ 8.  He did not receive any severance pay.  Resp. SMF ¶ 8.

### D.  Post-Employment Events

Plaintiff contends that, after his departure, the MDU specialist position was changed to require the salesperson to also perform physical installations in addition to sales.  Resp. SMF ¶¶ 14-15.  Another employee of Defendant, William Holbert ("Holbert"), sought to fill the position vacated by Plaintiff but was told that he was "too old."  Id. ¶ 65.  Defendant eventually filled the position with two individuals who were significantly younger than Plaintiff: Jeffrey Sydney (twenty-eight years younger) and Stephen Capousis (nineteen years younger).  Resp. SMF ¶ 66.

Defendant contends that Plaintiff was employed as a DSR in 2010, and that Defendant did not eliminate any DSR positions in 2010, but rather hired three additional DSRs to service MDUs.  SMF ¶ 14.  Defendant states that Plaintiff's job responsibilities were assumed by Jeffrey Sydney, who was over forty years old, and that two of the additional DSRs hired in 2010 were also over the age of forty.  SMF ¶ 15.

### E.  Procedural History

Plaintiff filed a complaint with the New York State Division of Human Rights in May 2010 and filed this action on June 20, 2011, bringing claims for violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, breach of contract, and attorneys' fees.  Compl. ¶¶ 4-5,

27-38.  Defendant filed its Motion and supporting Memorandum on March 18, 2013.  Mot.; Dkt No.

15 ("Memorandum").  Plaintiff then filed his Response and Cross-Motion, and Defendant filed a

Reply.  Cross-Mot.; Dkt Nos. 30-1 ("Response"); 33 ("Reply").  On June 14, Plaintiff moved

pursuant to Federal Rule of Civil Procedure 56(d) to reopen discovery and depose Holbert.  Dkt. No.

34 ("56(d) Motion").  After the Court granted Plaintiff's 56(d) Motion and the deposition was

conducted, Plaintiff filed an amended Statement of Material Facts and Defendant filed a

supplemental Memorandum.  Resp. SMF; Dkt. No. 48 ("Supplemental Memorandum").

## III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary

judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and of identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  If the non-moving party will bear the burden of proof on a specific issue at trial, the

moving party may satisfy its own initial burden by demonstrating the absence of evidence in support

of an essential element of the non-moving party's claim.  Id.  If the moving party carries its initial

burden, then the non-moving party bears the burden of demonstrating a genuine issue of material

fact.  Id.  This requires the nonmoving party to do "more than simply show that there is some

metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Corp.</u>, 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000); <u>Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.     ADEA

### A. Legal Standard

Plaintiff alleges age-based disparate treatment in violation of the ADEA. Compl. ¶¶ 27-30. ADEA discrimination claims proceed according to the familiar burden-shifting framework established in <u>McDonnell Douglas Corp. v. Greene</u>, 411 U.S. 792 (1973). <u>See</u> <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 105-06 (2d Cir. 2010). Under this framework, a plaintiff must first make out a prima facie case by showing that: (1) she was over the age of 40; (2) she was qualified for the position he held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. <u>Terry v. Ashcroft</u>, 336 F.3d 128, 137-38 (2d Cir. 2003). "A plaintiff's burden of establishing a *prima facie* case is *de minimis*." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 467 (2d Cir. 2001). If the plaintiff meets this minimal burden, the employer must offer a "clear and specific" nondiscriminatory reason for the adverse action. <u>Meiri v. Dacon</u>, 759 F.2d 989, 996-97 (2d Cir. 1985). Once such a reason is provided, the plaintiff can no longer rely on his prima facie case, but may prevail if he can show that the employer's determination was in fact the result of discrimination. <u>Holcomb v. Iona College</u>, 521

F.3d 130, 138 (2d Cir. 2008). "'[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010) (quoting Gross v. FBL Fin. Servs., 557 U.S. 167, 180 (2009)).

**B. Discussion**

*1. Prima Facie Case*

Defendant does not dispute that Plaintiff is a member of a protected class by virtue of his age or that he was qualified for his position. Defendant argues that Plaintiff cannot make out a prima facie case of discrimination because: (1) he was not subjected to any adverse employment action; and (2) even if he was subject to adverse employment action, it did not take place in circumstances giving rise to an inference of age-based discrimination. Mem. at 9; Reply at 6.

a. Adverse Employment Action

The ADEA prohibits an employer from, *inter alia*, "discharg[ing] any individual" over the age of 40 "because of such individual's age." See 29 U.S.C. §§ 623(a)(1), 631. "The 'discharge' element of an ADEA claim may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge." Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir. 1998). "A plaintiff may prove a constructive discharge by establishing that his employer, rather than acting directly, deliberately made his working conditions so intolerable that he was forced into an involuntary resignation, *i.e.*, so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Id. (alterations and internal quotation marks omitted). An employee need not show that an employer acted with the specific intent to cause the employee to

resign; rather, she need show only that the employer's actions were "deliberate and not merely negligent or ineffective." Petrosino v. Bell Atl., 385 F.3d 210, 229-30 (2d Cir. 2004) (quotation marks and alterations omitted).

In this case, Plaintiff proceeds on a constructive discharge theory, alleging that his April 2 meeting with Edwards and subsequent actions by Defendant forced him to resign. See Resp. at 5-7. According to Defendant, Plaintiff was not terminated, but voluntarily resigned from his position. See Dkt No. 6 ("Answer") ¶ 30; SMF ¶ 1. Defendant further argues that because Plaintiff offers proof of only the possibility of future changes in his employment, and those changes did not occur before he resigned, he cannot show that his working conditions prior to his resignation were sufficiently intolerable to constitute a constructive discharge. See Mem. at 13-14.

It is well established that a change in title or loss of pay may support a claim of constructive discharge. See, e.g., Scott v. Harris Interactive, Inc., 512 F. App'x 25, 28 (2d Cir. 2013). Additionally, a constructive discharge may be found where an employee decides to resign rather than suffer an impending demotion or pay cut. See id. (finding evidence of constructive discharge where employee ceased working after employer informed him his title would be changed and his salary reduced within two weeks); Bader v. Special Metals Corp., 11-CV-0882, 2013 WL 6264660, at *10 (N.D.N.Y. Dec. 4, 2013) (Kahn, J.) (finding that notice of "demotion alone might be sufficient to give rise to a constructive discharge claim" even though demotion "was never effected"); Morris v. New York City Dep't of Sanitation, 99-CV-4376, 2003 WL 1739009, at *5 (S.D.N.Y. Apr. 2, 2003) (finding evidence of constructive discharge where employee was told that if he did not retire, he would be demoted, his salary would be reduced by $25,000, and his future pension benefits diluted); Alfieri v. SYSCO Food Servs., 192 F. Supp. 2d 14, 24 (W.D.N.Y. 2001)

(noting that constructive discharge may be found where an employee is threatened with demotion); cf. Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired.").

Here, Plaintiff's supervisor told Plaintiff that his position would be significantly changed such that his compensation would decrease, and that he should retire. Resp. SMF ¶¶ 40-47. The only alternative his employer offered him was part-time employment, which would prevent him from receiving benefits, id. ¶ 47, and presumably would offer significantly less compensation. Based on this evidence, a rational factfinder could determine that Plaintiff, although he resigned before the anticipated changes to his position took place, was constructively discharged.

b. Inference of Discrimination

Defendant argues that even if Plaintiff suffered a constructive discharge, it did not occur under circumstances giving rise to an inference of age-based discrimination. Mem. at 15-16; Supplemental Mem. at 1-5. But Plaintiff has provided ample evidence of discriminatory intent, including that Plaintiff's position was filled by two individuals who were significantly younger than him,[4] and that Holbert, when he interviewed to fill the position Plaintiff vacated, was told by

---

[4] To satisfy the intent element of an ADEA prima facie case, a plaintiff does not need to show that he was replaced by an employee outside the protected class. O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996). Accordingly, that the employees who assumed Plaintiff's job duties were over forty does not negate the inference of discrimination created by the significant age discrepancy between those employees and Plaintiff. See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 78 (2d Cir. 2005) ("The 'far more reliable indicator of age discrimination' is the age discrepancy between the discharged employee and her replacement." (quoting O'Connor, 517 U.S. at 313)).

Edwards that Holbert was too old for the position.[5]  See Chambers v. TRM Copy Ctrs. Corp., 43

F.3d 29, 37 (2d Cir. 1994) (stating that "invidious comments about others in the employee's

protected group" and "more favorable treatment of employees not in the protected group" may

permit inference of discrimination).  When an employment discrimination case turns on the intent of

a party, a trial court should be particularly cautious before granting the "drastic provisional remedy"

of summary judgment.  Gallo v. Prudential Residential Servs., LP, 22 F.3d 1219, 1224 (2d Cir.

1994).  Accordingly, the Court finds that Plaintiff has satisfied his *de minimis* burden of establishing

a prima facie case of discrimination.

### 2. Articulated Non-Discriminatory Reason

Confident in its contention that no adverse action occurred and therefore Plaintiff has not

made out a prima facie case, Defendant maintains that it "is not required to offer a legitimate

business reason" for its actions.  Reply at 6.  The Court has already determined that Plaintiff has

made out a prima facie case.  By declining to offer a non-discriminatory reason for its actions,

Defendant has failed to rebut Plaintiff's prima facie case.

### 3. Vicarious Liability

Defendant argues that because Plaintiff did not suffer a tangible employment action and

---

[5] In his Complaint, Plaintiff also alleged that Edwards and most co-employees referred to him as "grandpa."  Compl. ¶¶ 15-16.  Plaintiff subsequently admitted that he told others to use that nickname and did not consider it discriminatory.  Resp. SMF ¶ 33.  While this admission may render the use of the grandpa appellation less offensive, it does not make it irrelevant.  That Defendant allowed and encouraged the continued use of such a term, even at the behest of Plaintiff, might be deemed relevant in determining whether Plaintiff was constructively discharged because of his age.  See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 116 (2d Cir. 2007) ("The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.").

failed to take advantage of Defendant's well-established anti-discrimination policies, it is entitled to summary judgment based on the Faragher/Ellerth affirmative defense[6] to vicarious liability.  Mem. at 14 n.9.  Plaintiff argues that: (1) the defense applies only to hostile work environment claims; (2) the defense does not apply in ADEA actions; (3) Defendant has waived the defense; and (4) even if the defense is available, Defendant has failed to prove that it is entitled to summary judgment. Resp. at 10-12.

a.  Applicability

i.  Constructive Discharge

"Against employee claims of hostile work environment and constructive discharge, the employer may have recourse to the so-called Faragher/Ellerth affirmative defense."  Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006).  "The defense comprises two elements: that (1) 'the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior,' and (2) 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'"  Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 766 (1998)) (alteration in original).  However, the employer may only raise the defense if "the employee's supervisor took no 'tangible employment action,' which involves an official company act, against the employee."  Ferraro, 440 F.3d at 101.  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a

---

[6] This affirmative defense was set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

13

significant change in benefits." <u>Ellerth</u>, 524 U.S. at 761. Such an action "requires an official act of the enterprise, a company act." <u>Id.</u> at 762. "The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." <u>Id.</u> Therefore, when a supervisor takes a tangible employment action against a subordinate, the employer is liable under the principles of agency law. <u>Id.</u> at 762-63. However, where a supervisor's harassment of a subordinate does not culminate in a tangible employment action, it is "less obvious" that the employer should be liable for the supervisor's acts. <u>Id.</u> at 764.

Both <u>Faragher</u> and <u>Ellerth</u> involved Title VII disparate treatment claims in which the alleged adverse employment action was a hostile work environment. <u>Faragher</u>, 534 U.S. at 780; <u>Ellerth</u>, 524 U.S. at 752. "A claim for hostile work environment requires the plaintiff to show discriminatory conduct that was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" <u>Ferraro</u>, 440 F.3d at 100 (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). <u>Pennsylvania State Police v. Suders</u> extended <u>Faragher</u>/<u>Ellerth</u> to compound hostile-environment constructive discharge claims—claims that a hostile work environment created "working conditions so intolerable that a reasonable person would have felt compelled to resign." 542 U.S. 129, 146-47 (2004).

Here, Plaintiff has brought neither a hostile work environment claim, nor a compound hostile-environment constructive discharge claim. Rather, he asserts that direct notice of impending and inevitable adverse changes in the terms and conditions of his employment compelled him to resign; no hostile work environment claim is at issue. His claim therefore appears closer to a pure constructive discharge claim than the claims at issue in <u>Faragher</u>, <u>Ellerth</u>, and <u>Suders</u>. <u>See</u> <u>Scott</u>, 512 F. App'x at 28 (noting that analyzing constructive discharge claim as "aggravated" claim of

14

hostile work environment is unwarranted "where the claimed constructive discharge is not alleged to stem from a hostile work environment"). Nevertheless, the reasoning of <u>Suders</u> makes clear that the availability of the <u>Faragher</u>/<u>Ellerth</u> defense extends to claims such as Plaintiff's:

> Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action. To be sure, a constructive discharge is functionally the same as an actual termination in damages-enhancing respects. . . . But when an official act does not underlie the constructive discharge, the <u>Ellerth</u> and <u>Faragher</u> analysis . . . calls for extension of the affirmative defense to the employer. As those leading decisions indicate, official directions and declarations are the acts most likely to be brought home to the employer, the measures over which the employer can exercise greatest control. Absent an official act of the enterprise, as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force.

<u>Suders</u>, 542 U.S. at 148 (internal citations and quotation marks omitted). There is no evidence that Plaintiff's constructive discharge was accompanied by an "official" act. Although he anticipated formal changes to his employment status, those changes had not yet occurred when he resigned. Furthermore, the sole company document explaining the cessation of his employment is an acknowledgment of his intention to retire. <u>See</u> Retirement Letter; SMF ¶ 7; Resp. SMF ¶ 7. <u>Suders</u> makes clear that such a document does not necessarily give an employer notice of possibly discriminatory behavior by a supervisor toward a subordinate. 542 U.S. at 148. Accordingly, because Plaintiff's alleged constructive discharge did not culminate in or result from a tangible employment action, the <u>Faragher</u>/<u>Ellerth</u> defense may be raised.

### ii. ADEA

Plaintiff asserts that the <u>Faragher</u>/<u>Ellerth</u> defense does not apply to age discrimination claims. Resp. at 11. The defense is derived from the inclusion of an employer's agents in the

definition of "employer" in Title VII of the Civil Rights Act. See Ellerth, 524 U.S. at 751-55 (discussing 42 U.S.C. § 2000e(b)). Although the ADEA's definition of "employer" is not identical to Title VII's, it likewise defines "employer" as including "any agent" of the employer. Compare 42 U.S.C. § 2000e(b) with 29 U.S.C. § 630(b). Accordingly, the Faragher/Ellerth defense can be applied to claims brought under the ADEA.[7] Defendant is nevertheless not entitled to summary judgment because it has waived the defense.

### b. Waiver

Plaintiff argues that Defendant cannot raise the Faragher/Ellerth defense now because it did not raise it in its Answer. Resp. at 10-11. Defendant concedes that it did not specifically plead the defense in its Answer, but argues that it may nevertheless raise it in support of its Motion because: (1) "Plaintiff has cited no precedent in this circuit requiring [Defendant] to plead the defense with specificity"; (2) Plaintiff's constructive discharge theory was not apparent based on the face of the Complaint, and Defendant therefore did not have a reason to assert the defense until the filing of Plaintiff's Response; and (3) the Court should exercise its discretion to allow Defendant to raise the defense because "in the event that [the Motion] is denied, [Defendant] can move to amend its answer to raise the defense." Reply at 6 n.2. Each of these arguments fails, and the Court finds that Defendant has waived the defense.

"In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." FED. R. CIV. P. 8(c). "It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal

---

[7] Several other districts courts have applied the defense to ADEA claims. See, e.g., Stofsky v. Pawling Cent. Sch. Dist., 635 F. Supp. 2d 272, 295 (S.D.N.Y. 2009) (collecting cases).

Rule 8(c) results in the waiver of that defense and its exclusion from the case . . . ." 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (3d ed. 2013); see also Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994) ("The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver."). However, "waiver of an unpleaded defense may not be proper where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party." Rose v. AmSouth Bank of Florida, 391 F.3d 63, 65 (2d Cir. 2004). Therefore, "a district court may entertain unpleaded affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." Id. (alterations omitted).

Defendant asserted several affirmative defenses in its Answer, but did not specifically raise the Faragher/Ellerth defense or otherwise reference the issue of vicarious liability. Answer ¶¶ 40-48.[8] Defendant argues that because the constructive discharge theory was not explicitly presented

---

[8] In its Answer, Defendant pleaded that "Plaintiff has failed to mitigate his damages." Answer ¶ 46. At least one Court of Appeals has found a general failure to mitigate damages defense to include Faragher/Ellerth. Howard v. City of Robertsdale, 168 F. App'x 883, 886 n.3 (11th Cir. 2006). Howard relied on Suders's description of Faragher/Ellerth as involving an employee's "duty to mitigate" damages. Id. The Suders plaintiff brought a compound hostile-environment constructive discharge claim, while Howard involved a hostile work environment claim. Here, Plaintiff brings only a constructive discharge claim. The meaning of damages mitigation differs significantly in these different contexts.

A plaintiff whose employment has been terminated or reduced by unlawful discrimination is entitled to back pay, see 29 U.S.C. § 626(b); 29 U.S.C. § 216(b), subject to the plaintiff's duty to mitigate damages from unemployment by using "reasonable diligence in finding other suitable employment," Ford Motor Co. v. E.E.O.C., 458 U.S. 219, 231 (1982). Therefore, in the context of a constructive discharge claim, a failure to mitigate damages defense can reasonably be interpreted as challenging the plaintiff's diligence in searching for a new job.

On the other hand, in a hostile work environment action, lost wages and back pay are unavailable absent a constructive discharge or hostile work environment so severe that it causes a plaintiff to miss work. See, e.g., Belts v. Costco Wholesale Corp., 558 F.3d 461, 475 (6th Cir.

until the filing of Plaintiff's Response, its Reply presented the first practical opportunity to raise the

defense. <u>See</u> Reply at 6 n.2. However, for several reasons, Defendant could have raised the defense

earlier.

First, Although the Complaint does not utilize the phrase "constructive discharge," it does

state that Defendant "forced [Plaintiff] to retire" and "forced [him] out of his job." Compl. at 1,

¶ 23. Such language constitutes a constructive discharge allegation. <u>See</u> <u>Kirsch</u>, 148 F.3d at 161

("A plaintiff may prove a constructive discharge by establishing that . . . a reasonable person in the

employee's shoes would have felt *compelled to resign*." (emphasis added)). Second, Defendant is

uniquely situated to know whether it fired Defendant or whether he quit. The Complaint's

allegation that Plaintiff's employment terminated in 2010, combined with Defendant's own

personnel records indicating Defendant retired, should have provided sufficient notice that

Plaintiff's ADEA claim was one to which Defendant could assert the defense. <u>See</u> <u>Suders</u>, 542 U.S.

at 148-49 (stating that <u>Faragher</u>/<u>Ellerth</u> defense is available in the absence of "an official act

reflected in company records"); cf. <u>Kerr-Clemens v. Arizona Bd. of Regents</u>, No. CV 05-642, 2007

WL 446354, at *3 (D. Ariz. Feb. 7, 2007) ("Plaintiff's meaning of 'involuntary termination' should

be clear to the Defendants because they know whether or not they fired the Plaintiff or she quit.").

Finally, Defendant's attempt to raise the defense in its Memorandum supporting its Motion

contradicts the assertion that it was unaware of the defense's availability until Plaintiff filed his

---

2009); <u>Locicero v. New York City Transit Auth.</u>, No. 06-CV-4793, 2010 WL 5135875, at *5
(E.D.N.Y. Dec. 9, 2010). Therefore, for a plaintiff whose sole alleged injury is a hostile work
environment, a failure to mitigate damages defense would most likely refer to whether the plaintiff
took steps to avoid or remedy the harassing behavior.

In sum, even if a hostile work environment plaintiff could reasonably be expected to
interpret a failure to mitigate damages defense as an invocation of <u>Faragher</u>/<u>Ellerth</u>, the same cannot
be said of a constructive discharge plaintiff.

Response.  See Mem. at 14 n.6.

The Court also finds that allowing Defendant to raise the Faragher/Ellerth defense at this stage would prejudice Plaintiff because he can no longer conduct discovery as to the defense.  See Resp. at 11.  Reopening discovery would further delay resolution of this case, and Defendant has not provided a sufficient explanation as to why that delay would not be undue.  Accordingly, the Court finds that Defendant has waived the Faragher/Ellerth defense.[9]

### c.  Application to this Case

Even if Defendant could raise the Faragher/Ellerth defense, it would not entitle it to summary judgment because Defendant has failed to prove either element of the defense.  See Resp. at 11-12.

First, whether Defendant exercised reasonable care to prevent and promptly correct any discriminatory behavior is a disputed issue of fact.  "An employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive."  Ferraro, 440 F.3d at 102.  Here, although Defendant maintained anti-discrimination and open door policies, SMF ¶ 4, their effectiveness is in doubt.  Plaintiff alleges that except for a five-minute meeting with Keib, he was repeatedly refused a meeting with either Edwards or Keib.  Resp. at 11.  Furthermore, although the Open Door Policy states that upon receiving notification of an

---

[9] Defendant asserts that if its Motion is denied, it can move to amend its answer to raise the defense.  Reply at 6 n.2.  Although leave to amend a pleading should be given freely when justice so requires, FED. R. CIV. P. 15(a)(2), it is appropriate for leave to be denied where the proposed amendment would cause undue delay or prejudice to the opposing party.  Foman v. Davis, 371 U.S. 178, 182 (1962); Manson v. Stacescu, 11 F.3d 1127, 1133 (2d Cir. 1993).  Accordingly, for the same reason waiver is appropriate, the Court would deny a motion for leave to amend.

employee's concern, a supervisor or department head "must notify" HR, and although Keib told

Plaintiff that he would reach out to HR regarding Plaintiff's concerns, Plaintiff received no follow-

up from Keib, HR, Edwards, or any other representative of Defendant.  See generally Resp. SMF.

Defendant has offered no explanation for this alleged failure to address Plaintiff's concerns.

Therefore, whether Defendant took reasonable steps to investigate Plaintiff's complaint and remedy

the behavior at issue remains in dispute.

Second, Defendant has not shown that Plaintiff unreasonably failed to take advantage of

available preventive or corrective opportunities.  Plaintiff met with Keib and expressed his desire to

keep his job.[10]  Resp. SMF ¶ 45.  Keib responded that he would contact HR, which led Plaintiff to

believe that Keib would resolve the issue.  Wilkins Decl. ¶ 9; Wilkins Dep. at 120-21.  When

Plaintiff showed up for a scheduled meeting with Keib, Keib was not there.  Resp. SMF ¶¶ 49-50.

Keib's secretary said she would call to reschedule, but Plaintiff was never given another meeting

with Keib, even after calling his office multiple times.  Id. ¶¶ 50-52.  Plaintiff also left multiple

---

[10] In support of its Faragher/Ellerth argument, Defendant states that Plaintiff never complained of "age discrimination."  Mem. at 15.  Defendant may be confusing Faragher/Ellerth with the standard for engaging in protected activity under a retaliation claim.  See Ramos v. City of New York, No. 96 CIV. 3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997) ("[I]n order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring.").  The Faragher/Ellerth defense requires the employee only to reasonably take advantage of any "preventive or corrective opportunities provided by the employer" or to otherwise avoid harm.  Faragher, 524 U.S. at 765.  It does not, as a matter of law, require the employee to specifically identify the unlawful purpose underlying unfair or harassing behavior.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105 (2d Cir. 2010) (stating that whether the defense applies "depends on the facts and circumstances of a given case").  This distinction is particularly important in this case, where some of the evidence supporting Plaintiff's claim of discriminatory animus did not become known to Plaintiff until after his employment ended.  See, e.g., Resp. SMF ¶ 65.  A contrary interpretation of Faragher/Ellerth would allow employers to defeat a discrimination action even where an employee did complain about a supervisor's discriminatory behavior, simply because the employee lacked full knowledge of the supervisor's motive.

messages with Edwards, but received no response.  Resp. SMF ¶ 54.  <u>Faragher</u>/<u>Ellerth</u> does not

require disparate-treatment plaintiffs, "in order to preserve their rights, [to] go from manager to

manager until they find someone who will address their complaints."  <u>Gorzynski v. JetBlue Airways</u>

<u>Corp.</u>, 596 F.3d 93, 104-05 (2d Cir. 2010).  Accordingly, that Plaintiff did not also contact HR

directly regarding his fear of losing his position does not, as a matter of law, prove that he acted

unreasonably,[11] and a rational factfinder could conclude from these facts that Plaintiff took

reasonable steps to report and remedy his concerns.

     For all these reasons, the <u>Faragher</u>/<u>Ellerth</u> defense does not entitle Defendant to summary

judgment on Plaintiff's ADEA claim.

## V.    ERISA

     Plaintiff alleges that Defendant violated ERISA by constructively discharging him in order

to avoid giving him the severance benefits to which he would have been entitled had he been

formally discharged.  Resp. at 11-13; Compl. ¶¶ 24, 34.

### A.  Legal Standard

     ERISA § 510 provides that "[i]t shall be unlawful for any person to discharge . . . or

---

[11] Plaintiff's deposition testimony creates further fact questions as to whether he took reasonable steps to express his concerns to HR, and whether Defendant's complaint procedures were adequate.  When questioned why he did not inquire further regarding his benefits during the April 14 meeting with an HR representative, Plaintiff explained that that particular HR representative was known to be dealing with serious personal problems.  Specifically, her husband had been in an accident and required care twelve hours a day, and she needed to support her two minor children.  Wilkins Dep. at 116:20-25, 120:10-17.  Plaintiff appears to have been embarrassed to raise his comparatively less serious life problems with this particular HR representative.  <u>See</u> <u>id.</u> In light of Plaintiff's claim that this was his only meeting with HR regarding his retirement, a reasonable factfinder could determine that Defendant's failure to provide a more formal, impersonal HR meeting was unreasonable, and that Plaintiff's failure to more forcefully raise his concerns at this meeting was reasonable.

discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled" under an employee welfare or benefit plan. 29 U.S.C. § 1140.[12] To succeed on a § 510 claim, a plaintiff must demonstrate that the employer specifically intended to interfere with benefits. Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988). There is therefore "no cause of action under section 510 where the loss of pension benefits 'was a mere consequence of, but not a motivating factor behind, a termination of employment.'" Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (quoting Dister, 859 F.2d at 1111). "'Because the existence of a specific intent to interfere with an employee's benefit rights is critical in § 510 cases—yet is seldom the subject of direct proof,' district courts apply the familiar McDonnell Douglas burden shifting framework to § 510 discrimination claims." Mayers v. Emigrant Bancorp, Inc., 796 F. Supp. 2d 434, 457 (S.D.N.Y. 2011) (quoting Dister, 859 F.2d at 1111-12). As described *supra*, the plaintiff must first make out a prima facie case, which creates a presumption of discrimination. See supra Part IV.A; see also

---

[12] The Complaint alleges that Defendant "forced [Plaintiff] to retire and is now refusing to provide him with the severance package due to a person laid off, through no fault of his own, by Defendant," and that "Defendant has violated Plaintiff's rights by not providing him the severance package he earned with his twenty-seven years of service." Compl. at 1, ¶ 24. The Fourth Cause of Action alleges that "Defendant violated ERISA by not providing Plaintiff the severance package offered in its handbook due to his age." Compl. ¶ 34. In its Memorandum, Defendant treated this claim as one brought under ERISA § 502(a)(1)(B), which provides a cause of action "to recover benefits due" to a participant under the terms of the applicable benefits plan. Mem. at 18 (citing 29 U.S.C. § 1132(a)(1)(B)). Defendant argues that the Complaint did not plead a § 510 claim, and that Plaintiff first invoked § 510 in his Response. Reply at 7. Federal Rule of Civil Procedure 8(a)(2) requires that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) does not require a plaintiff to "pin [his] claim to a precise legal theory," nor to provide "an exposition of his legal argument." Skinner v. Switzer, 131 S. Ct. 1289, 1296 (2011). Plaintiff's failure to identify the section of ERISA under which he is entitled to relief therefore does not affect the viability *vel non* of his claim. Furthermore, Plaintiff's Response clarified that he is bringing a § 510 claim, not a § 502(a)(1)(B) claim. See Resp. at 12-14.

Dister, 859 F.2d at 1111. The burden of production then shifts to the defendant, who must proffer a legitimate reason for its action. See Dister, 859 F.2d at 1111. If the defendant carries its burden, the presumption of discrimination disappears and the plaintiff must offer evidence reasonably supporting a finding of unlawful discrimination, which may include a showing that the defendant's proffered reason was a pretext for interference with benefits. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). "Since there is rarely direct proof of discriminatory intent, summary judgment should be used sparingly in ERISA actions." Tavoloni v. Mount Sinai Med. Ctr., 198 F.3d 235, 235 (2d Cir. 1999) (citing Dister, 859 F.2d at 1114).

### B. Discussion

#### 1. Prima Facie Case

A plaintiff establishes a prima facie case of unlawful termination under ERISA by showing that she: (1) belongs to a protected group, i.e., is an employee protected by ERISA; (2) was qualified for her position; and (3) was discharged (4) under circumstances that give rise to an inference of discrimination. See Dister, 859 F.2d at 1114-15.

The parties neglected to discuss or even mention the McDonnell Douglas framework in relation to Plaintiff's ERISA claim. However, Defendant's arguments can be characterized as challenges to the first, third, and fourth elements of the prima facie case.

#### a. Plaintiff's rights under ERISA

Defendant's severance pay plan provides that an employee is eligible for severance benefits if, *inter alia*, the employee "is terminated . . . because of cost-cutting measures, structural changes (including outsourcing) or lack of work as determined in the discretion of the Administrator . . . ." Plan § 2.1(a). Plaintiff contends that his discharge constitutes a cost-cutting measure or structural

change, and therefore should have entitled him to benefits under the plan had he been formally,

rather than constructively, discharged.  <u>See</u> Resp. at 13.

Defendant first argues that because Plaintiff voluntarily resigned, he was not terminated and

therefore would not qualify for severance pay.  Mem. 17; Reply at 8.  However, as discussed *supra*,

Plaintiff has provided sufficient evidence for a reasonable factfinder to decide that Plaintiff was

compelled to resign.  <u>See</u> <u>supra</u> Part IV.B.1.a.

Defendant also argues that even if Plaintiff was constructively discharged, he is ineligible for

benefits because constructive discharge is not listed in the Plan.  Resp. at 8.  This argument confuses

§ 510 with § 502(a)(1)(B).  "An ERISA Section 502(a)(1)(B) claim is essentially the assertion of a

contractual right under an employee benefit plan."  <u>Russell v. Northrop Grumman Corp.</u>, 921 F.

Supp. 143, 150 (E.D.N.Y. 1996).  A § 510 claim, on the other hand, "is not concerned with whether

a defendant complied with the contractual terms of an employee benefit plan that the employee has

qualified for."  <u>Id.</u>  Rather, it "makes unlawful the interference with a participant's ability to meet

these qualifications in the first instance."  <u>Id.</u>; <u>see also</u> <u>Sandberg v. KPMG Peat Marwick, LLP</u>, 111

F.3d 331, 334 (2d Cir. 1997) ("Section 510 protects against . . . the disruption of employment

privileges to prevent the vesting or enjoyment of benefit rights . . . .").  Accordingly, "[b]ecause

§ 510 of ERISA protects those employees who have an opportunity to attain rights in a covered

benefit plan," <u>Dister</u>, 859 F.2d at 1115, and Plaintiff would have had an opportunity to attain rights

to severance pay had he not been constructively discharged, Plaintiff is within a group protected by

ERISA.[13]

---

[13] Defendant also argues that Plaintiff's ADEA claim contradicts his assertion that he should
have received severance pay.  Mem. at 21; Reply at 7.  Even if Defendant did terminate Plaintiff
because of his age, Defendant argues, termination for age does not entitle an employee to severance

### b. Discharge

Defendant's assertion that Plaintiff was not constructively discharged also challenges the third element of Plaintiff's prima facie case. However, for the reasons discussed *supra* in the context of the ADEA claim, Plaintiff has produced evidence from which a reasonable factfinder could determine that he was constructively discharged. See supra Part IV.B.1.a. Accordingly, Plaintiff has met his burden as to the discharge element of the prima facie case.

### c. Intent

Finally, Plaintiff has met his *de minimis* burden of showing that Defendant specifically intended to interfere with his severance benefits rights. Plaintiff has alleged that, by constructively rather than formally discharging him, Defendant avoided paying him severance benefits. Resp. at 13-14. He has also alleged that Defendant's agents avoided meeting with him to discuss his job situation, see supra Part IV.B.3.c, creating a possible inference that Defendant deliberately sought to keep Plaintiff unaware that, by resigning, he would forfeit his severance pay rights.[14]

---

under the Plan. See Mem. at 21; Reply at 7. However, the relevant inquiry for a § 510 claim is not whether Plaintiff was entitled to benefits under the Plan's terms, but whether Plaintiff could have become entitled to severance benefits absent interference by Defendant. See Russell, 921 F. Supp. at 150. Furthermore, Defendant does not explain why a termination as a result of age-based discrimination could not also be considered a termination because of cost-cutting, structural changes, or lack of work. See Plan § 2.1(a).

[14] Factual determinations as to intent are inappropriate on summary judgment, and whether Plaintiff suffered adverse action because of his age or his severance benefits rights remains a question for the factfinder. However, because Defendant has implied that Plaintiff's ERISA claim is inconsistent with his ADEA claim, see, e.g., Mem. at 21, the Court notes that, as a matter of law, nothing precludes Plaintiff from succeeding on both his ADEA and ERISA claims. To succeed on his ADEA claim, Plaintiff must prove that age was the "but-for" cause of his constructive discharge, i.e., that he would not have been constructively discharged absent age-based animus. See Gross, 557 U.S. at 176-78. To succeed on his ERISA claim, Plaintiff need only show that his constructive discharge was "in part" motivated by a specific intent to interfere with his benefit rights. Dister, 859 F.2d at 1111; see also Humphreys v. Bellaire Corp., 966 F.2d 1037, 1043 (6th Cir. 1992) ("The

*2. Articulated Non-Discriminatory Reason*

In the context of Plaintiff's ADEA claim, Defendant maintains that because Plaintiff retired

voluntarily, and therefore was not constructively discharged, Defendant "is not required to offer a

legitimate business reason."  Reply at 6.  Although Defendant does not articulate its ERISA

arguments in terms of the <u>McDonnell Douglas</u> analysis, it appears to similarly rely on its argument

that no constructive discharge occurred and therefore refrains from articulating a legitimate reason

for its actions.  <u>See generally</u> 7-10.  Accordingly, Defendant has not rebutted Plaintiff's ERISA

§ 510 prima facie case, and is not entitled to summary judgment on this claim.

## VI.    BREACH OF CONTRACT

Plaintiff also alleges that Defendant's failure to provide severance benefits breached its

contract with him.  Compl. ¶ 32.  Defendant argues that ERISA preempts this claim.  Mem. at 21-

24; Reply at 8-9.

### A.  Legal Standard

ERISA § 514 provides that ERISA's provisions "supersede any and all State laws insofar as

they . . . relate to any employee benefit plan" covered by ERISA.  29 U.S.C. § 1144(a).  "A law

'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or

---

plaintiff is not required to show that the employer's sole purpose in discharging him was to interfere with his pension benefits, but rather that it was 'a motivating factor' in the decision."); <u>Giordano v. Thomson</u>, 438 F. Supp. 2d 35, 45 (E.D.N.Y. 2005) ("Plaintiff does not have to prove [intent to interfere with his ERISA rights] was Defendants' sole motivation, only that it was a motivation in Defendants' termination of Plaintiff.").  Accordingly, if the factfinder determines that the failure to pay severance benefits was merely a consequence of, rather than a motivation for, Plaintiff's constructive discharge, his ERISA claim will fail.  <u>See</u> <u>Dister</u>, 859 F.2d at 1111.  But if the factfinder determines that Defendant decided to terminate Plaintiff due to his age, and decided to do so by constructively discharging him in order to avoid paying him the severance benefits he would have collected upon formal termination, he can succeed on both claims.

reference to such a plan." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983). "As to state common law claims, ERISA preempts those that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 114 (2d Cir. 2008) (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 214, (2004)). Where a district court determines that a state law claim is preempted by ERISA, it may properly treat the claim as one brought under ERISA and decide it on the merits. See, e.g., Arditi v. Lighhouse Intern., 676 F.3d 294, 299-301 (2d Cir. 2012) (affirming dismissal of breach of contract claim because it failed to state a claim under ERISA).

**B. Discussion**

Plaintiff's breach of contract claim clearly "relates to" the Plan and is therefore preempted by ERISA. See Paneccasio, 532 F.3d at 114; Pronti v. CNA Fin. Corp., 353 F. Supp. 2d 320, 323-24 (N.D.N.Y. 2005) (Kahn, J.). To the extent Plaintiff alleges that Defendant breached its contract by constructively discharging him in order to deny him severance, the claim can be characterized as one brought under ERISA § 510. See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 145 (1990) (holding that ERISA provides "the exclusive remedy for vindicating § 510-protected rights"); Wood v. Prudential Ins. Co. of Am., 207 F.3d 674, 677 (3d Cir. 2000) ("A claim of discharge based on a 'benefits-defeating' motive comes under Section 510 of ERISA."). To the extent Plaintiff alleges that Defendant breached a contract by withholding severance benefits due under the terms of Plan, the claim is preempted by ERISA § 502(a)(1)(B), which provides a civil action "to recover benefits due" under a plan or to "enforce rights under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Although, as discussed *supra*, Plaintiff's § 510 claim survives the Motion, see supra Part V,

a § 502(a)(1)(B) claim would fail.  Before bringing an ERISA action for benefits in federal court, a plaintiff must exhaust any administrative remedies provided by the relevant plan.  See Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan, 572 F.3d 76, 79 n.3 (2d Cir. 2009); Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993).  The Plan provides a claims and appeals process, Plan §§ 7.1-7.7, and there is no evidence in the record showing that Plaintiff has filed such a claim, see SMF ¶ 24; Resp. SMF ¶ 24.  Accordingly, to the extent Plaintiff's preempted breach of contract claim can be construed as a claim for benefits under § 502(a)(1)(B), it must be dismissed.

## VII.    ATTORNEYS' FEES

The Complaint includes two causes of action for attorneys' fees.  Compl. ¶¶ 35-38. However, the Complaint does not cite the correct statutory provisions for fees under the ADEA and ERISA, see id., and Defendant has moved for summary judgment on this basis, Mem. at 24-25. Plaintiff has therefore cross-moved to amend the Complaint to cite the correct statutory provisions. Cross-Mot.; Dkt. No. 31-1 ¶¶ 35-38.

Pursuant to Federal Rule of Civil Procedure 15(a)(1) a party may, within certain defined time periods, amend a pleading as a matter of course.  If amendment as a matter of course is not permitted, a pleading may be amended only if the opposing party consents in writing or the court grants leave.  See FED. R. CIV. P. 15(a)(2).  Generally, a court "should freely give leave when justice so requires."  Id.  However, Federal Rule of Civil Procedure 16(b)(3)(A) requires the issuance of scheduling orders that "must limit the time to . . . amend the pleadings."  Such scheduling orders "may be modified only for good cause."  FED. R. CIV. P. 16(b)(4).  Thus, when a motion to amend is made after a scheduling order's deadline for doing so has expired, "the lenient standard under Rule

15(a) . . . must be balanced against . . . Rule 16(b)." <u>Grochowski v. Phoenix Constr.</u>, 318 F.3d 80, 87 (2d Cir. 2003). There is good cause for permitting modification of pleading-amendment deadlines where the party moving for modification has been diligent in doing so. <u>Id.</u> "[G]ood cause may not be established where the facts underlying the claim were known to the plaintiff at the time the action was filed." <u>Alexander v. Westbury Union Free Sch. Dist.</u>, 829 F. Supp. 2d 89, 118 (E.D.N.Y. 2011).

Here, although Plaintiff filed his Cross-Motion after the pleading amendment deadline, <u>see</u> Dkt. No. 14, there is good cause to grant it. Plaintiff does not seek to allege any new facts or claims; the amendment merely corrects a technical error in response to Defendant's Motion. Furthermore, because the Complaint gave Defendant sufficient notice that Plaintiff is seeking attorneys' fees, <u>see</u> Compl. ¶¶ 36, 38, the amendment will not cause prejudice. Plaintiff's Cross-Motion is therefore granted.

## VIII. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 24) for summary judgment is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Defendant's Motion (Dkt. No. 24) for summary judgment is **GRANTED** as to Plaintiff's breach of contract claim. Defendant's Motion (Dkt. No. 24) for summary judgment is in all other respects **DENIED**; and it is further

**ORDERED**, that Plaintiff's Cross-Motion (Dkt. No. 31) to amend the Complaint is **GRANTED**. Plaintiff shall, **within fourteen (14) days** of the date of this Memorandum-Decision and Order, file and serve the signed amended pleading in accordance with the Local Rules; and it is

further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED:      March 31, 2014
             Albany, New York

Lawrence E. Kahn
U.S. District Judge